UNITED STATED DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

CITY OF PRESCOTT, ARKANSAS, d/b/a                          PLAINTIFFS
PRESCOTT WATER AND LIGHT COMPANY;
PRESCOTT SCHOOL DISTRICT NO. 14,
solely in its capacity as a customer of Prescott
Water and Light Company; TOMMY POOLE,
solely in his capacity as a customer of Prescott
Water and Light Company; BANK OF DELIGHT, solely in its capacity as
a customer of Prescott Water and Light Company; and
FIRESTONE BUILDING PRODUCTS COMPANY, LLC,
solely in its capacity as a customer of Prescott
Water and Light Company

v.                                    CASE NO. 4:19-CV-04036-SOH

SOUTHWESTERN ELECTRIC POWER COMPANY                        DEFENDANT

## COMPLAINT

COMES NOW, the City of Prescott, Arkansas, doing business as Prescott Water and Light

Company, Prescott School District No. 14, solely in its capacity as a customer of Prescott Water

and Light Company; Tommy Poole, solely in his capacity as a customer of Prescott Water and

Light Company; Bank of Delight, solely in its capacity as a customer of Prescott Water and Light

Company, and Firestone Building Products Company, LLC, solely in its capacity as a customer of

Prescott Water and Light Company, by and through their counsel, Barber Law Firm PLLC and

McKenzie, Vasser & Barber, PLLC, and for their Complaint, states:

1.      Plaintiff, the City of Prescott, Arkansas, is a City of the First Class and a political

subdivision of the State of Arkansas that owns and operates a municipal utility company operating

as Prescott Water and Light Company (referred to herein as "Prescott") with its principal place of business located at City Hall, 118 West Elm Street, Prescott, Arkansas, 71857.

2.     Plaintiff, Prescott School District No. 14, is a public school district operating in Nevada County, Arkansas with its administrative offices located at 762 Martin Street, Prescott, Arkansas.  Prescott School District No. 14 is named solely in its representative capacity as a residential customer of the Prescott Water and Light Company.

3.     Plaintiff, Tommy Poole is a resident of Prescott, Nevada County, Arkansas who is named as a plaintiff in this cause of action solely in a representative capacity as a residential customer of Prescott Water and Power Company.

4.     Plaintiff, Bank of Delight is an Arkansas banking corporation with a branch located at 106 East 2nd Street, Prescott, Arkansas.  Bank of Delight is named in this cause of action solely in a representative capacity as a commercial customer of Prescott Water and Light Company.

5.     Plaintiff, Firestone Building Products Company, LLC ("Firestone") is an Indiana corporation with its principal place of business located at 200 4th Avenue, Nashville, Tennessee. Firestone has a place of business at 1406 US-371 in Prescott, Arkansas.  Firestone is named in this cause of action solely in a representative capacity as an industrial customer of Prescott Water and Light Company.

6.     Defendant, Southwestern Electric Power Company ("SWEPCO"), is a Delaware for-profit corporation with its principal place of business located in Shreveport, Louisiana. SWEPCO is registered to do business as a foreign corporation with the Arkansas Secretary of State, and its agent for service of process in the State of Arkansas is CT Corporation System, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas, 72201.

7.     This cause of action concerns the promises and representations that SWEPCO repeatedly made to either induce certain behavior by Prescott or to keep Prescott from taking actions for the purpose of protecting SWEPCO's financial interest, all of which were in violation of the agency and fiduciary relationship between Prescott and SWEPCO.

8.     Jurisdiction is proper before this Court pursuant to 28 U.S.C. § 1332 as Prescott is a municipality under the laws of the State of Arkansas and SWEPCO is a Delaware corporation with its principal place of business located in Louisiana.  Further, Plaintiffs Prescott School District No. 14and Bank of Delight are Arkansas entities with their principal places of business located in Arkansas.  Plaintiff Tommy Poole is an Arkansas resident.  Plaintiff Firestone is an Indiana corporation with its principal place of business located in Tennessee.  Venue is proper in this Court as SWEPCO has historically and continues to provide services to Prescott in Nevada County, Arkansas.

**FACTUAL BACKGROUND**

9.     The City of Prescott has a population of approximately 3,000 residents.

10.     The Prescott Water and Light Company, a division of the City of Prescott, owns and operates a municipal utility company that provides electric utility services to customers in and around the City of Prescott.  The system owned by Prescott has approximately fifty-five (55) miles of distribution service lines with some customers residing outside the city limits.

11.     Prescott provides electric power to three classifications of customers, those being residential, commercial and industrial.  The City of Prescott has 1,435 residential customers, 335 commercial customers and 6 industrial customers.

12.     Prescott does not generate its own electric power to then transmit to its customer-base.  Instead, the City must purchase capacity and energy from the electric grid maintained

throughout the United States. Prescott relies upon third-party agents to purchase and manage the load and capacity to meet its needs directly from the market.

13. Historically, Prescott relied upon its agreements with Entergy Arkansas, Inc. ("Entergy"), formerly Arkansas Power & Light, Inc., to serve as its wholesale power supplier. Entergy has and continues to own and maintain an electric supply substation in Prescott (the "Entergy Substation"). For many years prior to 2006, Entergy delivered electric power to the Entergy Substation and Prescott took delivery at this point and transmitted electric power to its customers.

14. In January 2006, Entergy unilaterally terminated the contract under which it supplied wholesale power to Prescott.

15. Once Entergy ended this relationship, Prescott purchased electric power from the Arkansas Electric Cooperative Corporation on a temporary basis until January 2009.

16. Prescott attempted to find a generation and transmission source within the Entergy Transmission System footprint from which to purchase the electric power needed to meet the needs of its customers. Entergy rejected Prescott's proposals to purchase such power, telling Prescott that any such arrangements would cause an overload on its system.

17. With no apparent supplier within the Entergy Transmission System footprint, Prescott was forced to turn to other suppliers, including SWEPCO.

18. SWEPCO is a wholly-owned subsidiary of American Electric Power Company, Inc. American Electric Power Company, as of 2017, generated approximately 26,000 megawatts of electricity for use on the grid and sold approximately 194 million megawatt hours of electricity to its 5.4 million customers in the United States. Further, it owns and maintains approximately 40,000 miles of transmission lines in the United States.

19.     SWEPCO owns and operates facilities for the generation, transmission, and distribution of electric capacity and energy in the states of Arkansas, Louisiana, and Texas. SWEPCO serves approximately 530,000 retail customers.

20.     On or about June 30, 2008, Prescott and SWEPCO entered into a Power Supply Agreement (the "Original PSA").  Under the Original PSA, Prescott became a wholesale electric customer of SWEPCO.

21.     The Original PSA (and all of the PSAs thereafter) served two primary functions. First, it required that SWEPCO provide capacity and energy to Prescott.  Prescott would then distribute the purchased capacity to its customers.  The capacity cost was subject to adjustment on an annual basis.  The capacity cost that SWEPCO charges its wholesale customers, such as Prescott, is based upon SWEPCO's own power generation.  The energy charges assessed by SWEPCO to its wholesale customers is computed based upon SWEPCO's cost for its entire load of energy, both generated and purchased from the wholesale market.

22.     The second primary function of the PSAs between SWEPCO and Prescott was to engage SWEPCO as Prescott's agent for dealing with all transmission matters.  As discussed in more detail below, in its role as agent for Prescott, SWEPCO was responsible for navigating the wholesale electric market to secure the necessary capacity for use by Prescott.

23.     Prescott began purchasing its wholesale electric capacity from SWEPCO in January 2009.

24.      SWEPCO did not own an electric substation in Prescott.  Through discussions between representatives of Prescott and SWEPCO, Prescott learned that SWEPCO was not willing to construct such a substation.

25.     Accordingly, Prescott was required to accept delivery of the wholesale electric capacity that it purchased from SWEPCO at and through the Entergy Substation located in Prescott.

26.     Prescott and Entergy Services, Inc. ("ESI"), entered into or extended a Network Integration Transmission Service Agreement dated December 10, 2008 (the "NITS"). See **Exhibit A** attached hereto.  The NITS stated that American Electric Power Service Corporation ("AEP"), as an agent for SWEPCO, "shall serve as agent for the Transmission Customer."  Exhibit A, § 1.0. The "Transmission Customer" under the NITS is Prescott.  Exhibit A, § 1.0.  The Entergy Substation was part of the tariff under the NITS and later became part of the Wholesale Distribution Service (WDS) Agreement negotiated when MISO became effective.

27.     Under the NITS, Prescott agreed to pay the charges applicable to a "Transmission Customer" under Part III of ESI's tariff.

28.     When Prescott began purchasing wholesale capacity from SWEPCO, the charges incurred by Prescott included the capacity and energy charges assessed by SWEPCO, the tariff charges from Entergy, as well as a fixed 3.00% loss factor of usage charge by Entergy.

29.     Prescott and SWEPCO later entered into that certain Revised and Restated Power Supply Agreement dated October 15, 2010 (the "2010 PSA").  See 2010 PSA attached hereto as **Exhibit B**, with such PSA being approved by FERC on March 22, 2012 (see **Exhibit C** attached hereto).  Since the beginning of the relationship between Prescott and SWEPCO, the Power Supply Agreements between the parties have been revised concerning the amounts that SWEPCO may charge Prescott for the capacity distributed by SWEPCO.  However, throughout the revisions to the various Power Supply Agreements, the obligations and duties of SWEPCO have not materially changed.  For purposes of reference herein, Prescott will draw from and cite to the 2010 PSA

(Exhibit B) as the parties' obligations under the subsequent PSAs are materially the same as those set forth in the 2010 PSA.

30.    The charges assessed to Prescott under the 2010 PSA were materially the same as those assessed under the Original PSA, at least initially.

31.    The term of the 2010 PSA extends through 2038.  SWEPCO may terminate the agreement without cause upon providing Prescott with three (3) years advance notice (Exhibit B, § 2.02); however, the 2010 PSA provides no avenue for Prescott to terminate the agreement without cause.

32.    Under the 2010 PSA, the parties agreed as follows:

> The Company [SWEPCO] shall plan for and provide the Requirements Service contracted for hereunder in the same manner as the Company plans for and provides service to its retail customers. The Company's obligation to provide service to Customer [Prescott], and the Customer's obligation to take service from the Company under this Agreement, shall terminate at the end of the Term provided for herein, subject to any notice of termination that the Company may be required to submit under FERC's regulations.

Exhibit B, § 2.03.  The term "Requirements Service" is defined in the 2010 PSA to mean "Capacity and Firm Energy supplied by Company to the Points of Delivery, as the same may fluctuate in real time to serve Retail Load and the associated transmission and distribution losses."  Exhibit B, § 1.39.  The term "Capacity" is defined as "the real power output capability of generating facilities to generate electric power, expressed in kilowatts, and determined in accordance with SPP Criteria."  Exhibit B, § 1.08.

33.    Generally, among other requirements, the 2010 PSA required that SWEPCO purchase electric capacity from the open market and deliver the electric capacity necessary to meet the demands of the fluctuating retail electric power requirements of Prescott's retail, commercial

and industrial customers.  SWEPCO requires that Prescott provide a rolling eight (8) year forecast of its expected retail load needs by June 1 each year under the 2010 PSA.  Exhibit B, § 2.03.

34.     The 2010 PSA provides SWEPCO will act as Prescott's agent for the arrangement of the transmission of the wholesale purchased capacity to Prescott.  Exhibit B, § 3.02.

35.     The phrase "Network Integration Transmission Service" or "NITS" (as used in Section 3.02 of the PSA and elsewhere) is defined to mean "firm transmission service as set forth in the SPP Open Access Transmission Tariff and the Entergy Open Access Transmission Tariff that provides for delivery of capacity and energy from the designated Network Resources at the Points of Delivery to the Network Load at the Points of Receipt."  Exhibit B, § 1.29.  The "Point of Receipt" is the Entergy Substation located in Prescott (the "Entergy Substation").  Exhibit B, § 1.34 and Sheet No. 57.

36.     The reference to "SPP" in Section 1.34 and in numerous other locations throughout the 2010 PSA is to "Southwest Power Pool."  SPP is defined in the PSA as "Southwest Power Pool, or its successor, in its capacity as the regional Transmission Provider or independent system operator for the Company's control area organized and operating pursuant to the SPP Related Documents."  Exhibit B, § 1.41.

37.     SPP is a Regional Transmission Organization ("RTO") that the Federal Energy Regulatory Commission ("FERC") approved to oversee and administer the bulk electric grid and wholesale power market in fourteen (14) states throughout the central United States.  While SPP does not own the electric transmission lines within its footprint, it regulates the flow of electrical power in its region.  SPP administers an Open Access Transmission Tariff, as approved by FERC, and receives payment under such tariff for the services it provides to companies such as SWEPCO.

38.     SWEPCO, headquartered in Shreveport, Louisiana is within SPP's footprint and is a member entity of SPP.   SPP directs and oversees the flow of electric capacity over the transmission lines of the member entities (such as SWEPCO) within the territory granted to SPP by FERC.  In exchange for these services, SPP collects charges from Prescott for the transmission of electric capacity over and across the transmission system operated by SPP, which includes the transmission system owned by SWEPCO.

39.     SPP sends a monthly invoice directly to Prescott for transmission charges.

40.     Due to the necessity for SWEPCO to deliver Prescott's purchased capacity to the Entergy Substation, Prescott had to pay (a) transmission charges from SPP (assessed under the FERC-approved SPP Open Access Transmission Tariff) and (b) transmission charges from Entergy (assessed under the FERC-approved Entergy Open Access Transmission Tariff).  Even with having to pay both transmission charges, this arrangement was the most economical manner for Prescott to receive reliable electricity to meet the demands of its customers.

41.     Prescott's transmission charges materially changed in early 2014.

42.     Historically, Entergy was not a member of an RTO.  It was not a member of an RTO when Prescott and SWEPCO entered into the 2010 PSA (Exhibit B) or when Prescott entered into the NITS with ESI (Exhibit A).

43.     On December 19, 2013, Entergy became a member of the RTO known as Midwest Independent System Operator, Inc. ("MISO").  As discussed above, SPP is one of nine (9) RTOs and ISOs ("Independent System Operators") approved by FERC throughout the United States, and SWEPCO is a member of SPP.  MISO is another FERC-approved RTO that manages the delivery of electricity throughout fifteen (15) states in the midwest United States.   MISO manages approximately 65,000 miles of high-voltage transmission and 200,000 megawatts of power-

generating resources across its footprint.  Portions of Arkansas are within MISO's service footprint.

44.     SWEPCO is not a member of MISO, as the transmission system that it owns is not located within MISO's footprint.

45.     The Arkansas Public Service Commission approved Entergy's integration into MISO through various Orders in Docket No. 10-011-U, one of which was Order No. 77 dated September 18, 2013.  The integration of Entergy's transmission system into MISO became effective on December 19, 2013.  At this time, MISO, as ESI's successor in interest, became the counter-party to Prescott under the NITS (Exhibit A).

46.     Prescott feared that its transmission charges would increase if Entergy joined MISO, and it took action to protect its interest.

47.     During the proceeding before the APSC, Prescott filed testimony objecting the Entergy's request to integrate its transmission system into MISO.  On March 16, 2012, Prescott filed the testimony of Henry Thompson, a retired engineer from Entergy who served as a consultant to Prescott, in APSC Docket No. 10-011-U.

48.     Mr. Thompson testified that the Entergy Transmission System's integration into MISO would result in "congestion costs" being charged to Prescott.  Mr. Thompson testified that Prescott had not been historically charged such congestion costs.  Generally, wholesale electricity transmission congestion occurs when there is not enough transmission capability to support all the requests for transmission services in the market.  Demand for wholesale capacity will increase during peak usage hours of the day and will vary based upon numerous factors, including, but not limited to, weather conditions.  In order to ensure the reliable delivery of electricity, transmission system operators may release capacity that is generated at a higher cost into the market to meet

demand, meaning that RTOs, such as MISO, have to pay more for such capacity or energy and thus the RTO energy cost is increased for all parties.  Also, transmission system operators may deny some requests for capacity so as to prevent transmission lines from becoming overloaded in such periods of high demand.  The amounts that RTOs must pay to gain access in the transmission system during such peak hours are collectively referred to as "congestion costs."

49.     Prescott also offered the testimony of Mr. Thompson in support of its objection to the integration of Entergy's system into MISO because of the excessive "pancaking" and congestion charges that it feared would result.

50.     The RTOs spanning the United States each have distinct geographic regions, and RTOs are allowed to charge a single fee for use of its entire transmission grid.  See 18 C.F.R. § 35.34(j)(2) and (k)(1)(ii).  "Pancaking" occurs when generated capacity purchased from the nationwide grid is transported over transmission lines located in the footprints of more than one RTO.  FERC granted each RTO a particular footprint in the United States.

51.     A portion of the boundary line between SPP's designated territory and MISO's designated territory is located in Fulton, Arkansas, which is approximately 30 miles southwest of Prescott along Interstate 30.

52.     While this may be the expected route for electrical flow, to ensure deliverability, Prescott purchased NITS transmission service from SPP which allows Prescott to utilize the entire SPP controlled transmission system to receive its required power.  SPP sends Prescott an invoice for transmitting wholesale power to the SPP/MISO interface.

53.     The equivalent amount of wholesale capacity is then transmitted to the Entergy Substation across the MISO controlled transmission system.  MISO sends SWEPCO, as Prescott's agent, an invoice for utilization of the entire MISO transmission system and the Entergy

Substation.  Once the capacity and energy reaches the Entergy Substation, Prescott delivers the capacity and energy to its customers.

54.     Due to this geographic allocation of service territories, Mr. Thompson testified that Prescott feared that excessive pancaking and congestion would result if Entergy became a member of MISO, because both SPP and MISO (seeking to be Entergy's RTO) would both attempt to assess transmission charges for transmission across lines located within their respective territories.

55.     Mr. Thompson further testified that the pancaking issue would be avoided if SWEPCO had its own transmission line that would do away with the need for Prescott's capacity to transmit over the Entergy lines (within the MISO territory) to the Entergy Substation in Prescott. Mr. Thompson testified that new facilities could be constructed to connect SWEPCO's existing facilities around Nashville, Arkansas to Prescott.  Such new facilities would have allowed SWEPCO to get the necessary capacity to Prescott without MISO imposing any congestion or pancaking charges on Prescott.

56.     Another alternative offered by Prescott through Mr. Thompson's testimony called for the APSC to require that a supplier located within MISO acquire by purchase or assignment the PSA between Prescott and SWEPCO so that such supplier would be Prescott's wholesale power supplier, meaning that MISO would be the only RTO charging transmission charges for Prescott's capacity.

57.     Following the submission of Mr. Thompson's testimony in support of Prescott's objection to Entergy becoming a member of MISO, SWEPCO approached Prescott asking that the City withdraw its objection.

58.     Prescott made clear that the only way it would withdraw the objection was if SWEPCO resolved Prescott's concerns over the potential for excessive rate pancaking and congestion costs should Entergy join MISO.

59.     SWEPCO repeatedly represented to Prescott that Entergy's integration into MISO would not adversely impact the transmission charges paid by Prescott for the wholesale capacity delivered at the Entergy Substation.  Moreover, SWEPCO assured Prescott that it would intervene with Entergy and MISO to address and remedy any issues or problems if they did arise (collectively, the "June 2012 Assurances").

60.     Based upon these assurances from SWEPCO, Prescott withdrew its objection to the integration on June 14, 2012 through a letter filing in APSC Docket No. 10-011-U.  The letter from Prescott's Mayor mentions SWEPCO's pledge to "remedy any seams issues and other problems Prescott is facing with the changing landscape in its transmission services."  **Exhibit D** attached hereto.

61.     The parties met in late June 2012 to discuss the details of the promises made by SWEPCO that resulted in Prescott withdrawing its objection before the APSC.

62.     On June 28, 2012, Prescott (represented by Mayor Terry Oliver, Billy House, and Henry Thompson), the City of Hope (represented by General Manager Jim Kirchhoff, David Fincher, Russell Cornelius), SWEPCO (represented by Woody Lally and Dale Colvin) and several transmission representatives from AEP met in Hope, Arkansas to discuss the rate pancaking and congestion concerns of Prescott and Hope (the "June 2012 Meeting").

63.     At the conclusion of the June 2012 Meeting, the parties reached an agreement that (a) Hope would donate its existing 115 kv transmission line between Hope and the Fulton area to SWEPCO, (b) SWEPCO would construct a 115 kv line from Hope to Prescott, and (c) SWEPCO

would construct a 115/13.8 kv substation to serve Prescott (thereby doing away with the need to use the Entergy/MISO Substation).

64.     No action by SWEPCO was apparent to Prescott in the months following the June 2012 Meeting.  Hope and Prescott convened another meeting in Hope on April 24, 2013.  The participants in this meeting included: Mayor Terry Oliver, Bruce Bean, and Henry Thompson (for Prescott), General Manager Jim Kirchhoff, David Fincher, and Russell Cornelius (for Hope), Woody Lally and Dale Colvin (for SWEPCO) and Other representatives of AEP transmission services.

65.     Prescott did not have the financial means to outlay the resources necessary to construct such improvements.

66.     After Entergy's integration into MISO became apparent, and with its continued concern over increased charges in early 2014, Prescott requested a meeting with SPP and SWEPCO in Little Rock in late 2013.  Among others, Carl Monroe, Chief Operating Officer of SPP, and Woody Lally, Director of Energy Marketing for SWEPCO, were in attendance (the "Late 2013 Meeting").  Prescott's representatives left the Late 2013 Meeting with assurances from SWEPCO and SPP that the SPP changes would, in fact result in lower charges.  After the late 2013 Meeting, Prescott received further assurances from SWEPCO that it would work with Entergy and MISO to resolve the pancake concerns.

67.     On February 3, 2014, SWEPCO filed a revised PSA in FERC Docket No. ER14-1250 in order to update the Prescott PSA for the purpose of the SPP Integrated Marketplace.  FERC issued an order finding that the revised PSA might be unjust and unreasonable and ordered

SWEPCO and Prescott to attempt to settle this matter.  Settlement negotiations took place through the summer of 2014 and an offer of settlement was filed by SWEPCO on August 14, 2014.[1]

68.     Entergy's integration into MISO as of December 19, 2013 resulted in new transmission charges being assessed to Prescott by MISO.

69.     In addition, SPP expanded its services to include an Integrated Marketplace on March 1, 2014.  SPP's Integrated Marketplace includes a day-ahead energy market, a real-time energy market, and an operating reserve market.  SPP's Integrated Marketplace also includes a market for "Transmission Congestion Rights."   While the SPP Integrated Marketplace was intended to provide energy to SPP's members on a least-cost basis, SWEPCO's involvement has resulted in increased "transmission pancake" costs to Prescott.

70.     As a result of these two changes, the transmission charges assessed to the wholesale power that Prescott purchased from SWEPCO increased significantly in 2014.  In and before December 2013, the charges attributable to Prescott's transmission and use of the Entergy Substation were approximately $65,000.00 per month.  Thereafter, even though Prescott's use of the Entergy Substation and load purchase remained consistent, the costs increased dramatically.

71.     MISO only sends its monthly invoices to the Market Participant that purchases the wholesale electric power transmitted over its lines within its footprint.  Accordingly, MISO sends SWEPCO a monthly invoice for the power it transmits to the Entergy Substation.  These monthly invoices include transmission, congestion and administrative charges.  SWEPCO then passes the MISO charges along to Prescott.

---

[1]  This settlement called for revisions to SWEPCO's 2014 tariff, and added Exhibit C to the PSA related to the SPP Integrated Marketplace.  The issues that were the subject of this settlement are not addressed in this lawsuit.

72.     Prescott continuously brought the excessive charges to SWEPCO's attention. SWEPCO never actually took any action to remedy the excessive charges.

73.     Prescott and Hope again asked SWEPCO to meet on April 29, 2015 to determine how to resolve the issues of rate pancaking and the drastically increased congestion charges being assessed by MISO and SPP.  While discussions continued, SWEPCO failed to take any definitive action to remedy the continuing harm to Prescott and Hope.

74.     Prescott and SWEPCO again convened on January 6, 2016.  Prescott attended with the belief that both parties would act in good faith to reach a solution to the continuing rate pancaking and congestion charges issues.  Prescott was represented at the meeting by Bruce Bean, Larry Jones, and Henry Thompson.   SWEPCO was represented at the meeting by Venita McCellon-Allen, its President, Woody Lally and Carey Sullivan, its Director of Communications. At the conclusion of this meeting, Ms. McCellon-Allen told Prescott that those SWEPCO representatives who had promised to build a transmission line and substation for use by Prescott did not have the authority to make such promises.

75.     In February 2016, Prescott sought the assistance of the FERC Dispute Resolution Division in attempting to eliminate the rate pancaking charges.  Following a teleconference on May 5, 2016, Prescott and SWEPCO worked together to prepare documents demonstrating evidence of Prescott's pancake rate charges.   After SWEPCO, MISO, and SPP exchanged information, the parties attended an in-person conference at FERC on June 14, 2016.  Even though discussions continued during 2016, no progress was made as SWEPCO continued to offer no financial support to remedy the rate pancaking and increased congestion charges.

76.     In 2016, Prescott was approached by a third-party independent transmission marketing company, GridLiance.  GridLiance offered to replace AEP/SWEPCO as Prescott's

Market Participant for market transmission services.  GridLiance proposed to build a 115 kv transmission line between Hope and Prescott with an interconnection to Entergy/MISO.

77.     When SWEPCO learned of GridLiance's proposal, its President at the time, Venita McCellon-Allen, contacted Prescott to again set up discussions of SWEPCO remedying the rate pancaking problem.  On January 19, 2017, SWEPCO, Prescott and their respective counsel, held an extensive conference call, at the conclusion of which SWEPCO pledged to construct the necessary transmission line directly to the Prescott area to a new Prescott Substation with an RTO (SPP) to RTO (MISO) interconnection, with this line also providing service to Hope, Arkansas (the "January 2017 Assurances").

78.     In reliance upon the January 2017 Assurances, Prescott ended its discussions with GridLiance.  Prescott had a good faith belief, based upon the specific assurances made by SWEPCO in January 2017, that SWEPCO would remedy the rate pancaking and take proper actions to avoid congestion charges.

79.     In April 2017, Ms. McCellon-Allen wrote Prescott stating, "I want to let you know SWEPCO is pursuing multiple fronts to attempt to alleviate duplicate transmission charges for Prescott customers."  See electronic message from Venita McCellon-Allen to Larry Jones and Henry Thompson, dated April 20, 2017, attached hereto as **Exhibit E.**

80.     Ms. McCellon-Allen and Mr. Sullivan came to Prescott in early June 2017 to discuss matters with Mayor Oliver, Bruce Bean, Larry Jones, and Henry Thompson.  SWEPCO represented that it could remedy the rate pancaking issue as part of a project it was preparing to construct in Hope.  The parties again met on June 12, 2017, with SWEPCO being represented by Ms. McCellon-Allen, Brian Bond, Matthew Gauss, Dale Colvin, Jennifer Harland, and Carey Sullivan, and Prescott being represented by Mayor Oliver, Bruce Bean, Larry Jones and Henry

Thompson.  At the conclusion of this meeting, SWEPCO agreed to get back to Prescott with several proposals to solve the rate pancaking problems.

81.     SWEPCO came back to Prescott with three proposals as a result of the June 12, 2017 meeting.  See **Exhibit F** attached hereto.  The proposals were: (1) neither party do anything and Prescott continue to pay approximately $770,000 per year in increased charges related to Entergy's integration into MISO; (2) SWEPCO would construct a transmission line from Hope to Prescott and a substation in Prescott, and Prescott would pay SWEPCO service charges to use the facilities; or (3) SWEPCO construct a transmission line from Hope to Prescott and Prescott construct a substation.

82.     Option 1 (above) provided no relief to Prescott.  Option 2 provided no short term relief to Prescott as the annual service charges payable by Prescott to SWEPCO would rival the amount it had been paying for rate pancaking.  Option 3 was unacceptable to Prescott as it was nothing more than what SWEPCO had been discussing for some time and required a significant cash outlay by Prescott, which it could not afford.

83.     Even though numerous discussions took place in 2017, SWEPCO eventually said that due to the evolution of its relationship with SPP, SWEPCO no longer planned to construct any transmission facilities that were not approved by SPP.

84.     SWEPCO advised Prescott that it should take its complaints to SPP and MISO.

85.     In the late summer of 2017, seeing no other viable options, Prescott sought to find another wholesale electric provider within MISO's footprint.  Prescott believed that moving away from SWEPCO (which has SPP as its RTO) to a supplier under MISO's jurisdiction would at least result in Prescott not having to pay fees to two RTOs.

86.     To accomplish this move to a new provider, Prescott took the actions it thought necessary under the Network Integration Transmission Service Agreement (the "NITS" attached hereto as Exhibit A).  When Entergy integrated its transmission system into MISO, MISO became the counter-party to Prescott under the NITS.

87.     In September 2017, Prescott learned from the Arkansas Electric Cooperative Corporation ("AECC") that MISO would not conduct the requisite study for its move to another wholesale electric supplier unless another subsidiary of AEP requested the study.  MISO stated that Prescott's "Market Participant" under the NITS was the only party that could request such a study.  AECC, a provider located in MISO's footprint, had inquired about the study on Prescott's behalf as it was a potential provider for Prescott.

88.     After learning this, Prescott made demand upon SWEPCO to follow the proper channels to request the study from MISO to allow Prescott to move to a wholesale supplier within the MISO footprint.  Obviously, Prescott moving to a supplier within the MISO footprint would result in Prescott no longer purchasing capacity and energy from SWEPCO.

89.     SWEPCO, as Prescott's agent and Market Participant, refused to request the required study from MISO.

90.     On September 14, 2017, Prescott submitted a form known as "Attachment B" requesting that the city itself receive notices of actions and be the point of contact with MISO, instead of SWEPCO or AEP.  See **Exhibit G** attached hereto.  Further, Prescott requested that MISO conduct a study so that Prescott could use another Market Participant.

91.     On September 15, 2017, MISO responded that it could not accept the Attachment B submitted by Prescott because AEP was the only entity that could make the request.  See **Exhibit H** attached hereto.

92.     Upon receipt of this response from MISO, Prescott sent correspondence to SWEPCO/AEP seeking to immediately terminate any authority that SWEPCO/AEP had to intake model changes to the MISO or SPP commercial models.  See **Exhibit I** attached hereto, pp. 1-2.  Prescott requested that SWEPCO/AEP submit the required information to MISO to implement this change in authority.  After receiving no response for a week, Prescott sent a follow-up letter regarding this request.  Exhibit I, p. 3

93.     SWEPCO/AEP refused to take the actions required by MISO to modify its authority under the NITS.  See **Exhibit J** attached hereto.

94.     Without SWEPCO/AEP taking the action requested by Prescott, Prescott cannot choose a new Market Participant.

95.     Prescott has no method through which it can move to a wholesale electric supplier within MISO's footprint without the cooperation of SWEPCO, and SWEPCO has refused to act according to Prescott's instructions.

96.     In late 2017, while Prescott was attempting to replace SWEPCO, SWEPCO again made assurances to Prescott in an attempt to quiet Prescott's complaints.  SWEPCO represented to Prescott that charges would be reduced (thereby offsetting any rate pancaking and congestion charges) once its Wind Catcher Project came into production (the "Wind Catcher Promises").  Under this Project, SWEPCO and its sister company, Public Service Company of Oklahoma, would purchase a 2,000 MW wind farm under construction in western Oklahoma.  SWEPCO would then construct a 350 mile dedicated, extra-high voltage generation tie-line from the farm to the Tulsa area to efficiently deliver the renewable energy to customers.  SWEPCO forecasted a service date of December 2020 for the Wind Catcher Project.

97.     After months of discussion, the parties memorialized their agreement in a letter dated February 23, 2018.  See **Exhibit K** attached hereto (the "Wind Catcher Agreement").  While the Wind Catcher Agreement did not do away with the rate pancaking and congestion charges from MISO to Prescott, Prescott saw the Wind Catcher Agreement as a financial means by which the city could get some relief.  In exchange for the financial incentives offered by SWEPCO, Prescott agreed not to object to SWEPCO's efforts to gain regulatory approval for the Wind Catcher Project before FERC or the APSC.

98.     In late July 2018, SWEPCO withdrew its application to purchase the Wind Catcher Project, thereby negating Prescott's ability to receive all of the relief it was assured through the Wind Catcher Promises.  While all of the relief from the Wind Catcher Agreement was not contingent on the Wind Catcher Project coming online, most of the financial relief to Prescott was dependent on revenues that would be generated from the Wind Catcher Project.

99.     Separate and apart from the rate pancaking that has taken place since Entergy joined MISO, Prescott has also been forced to pay excessive congestion charges imposed by MISO.

100.     When Entergy joined MISO, Prescott became a wholesale customer within MISO's footprint.  Prescott was allocated "Financial Transmission Rights" ("FTRs") in the MISO system.  Wholesale electric purchasers, such as SWEPCO, can use FTRs as a financial hedging mechanism to lock in charges on MISO's "Day-Ahead Market" so as to avoid being subject to higher, unpredictable charges based upon demand for electricity on the day of purchase.

101.     Prescott (an entity that cannot take part in the Day-Ahead Market) relied upon SWEPCO's expertise in the use of FTRs to ensure that Prescott avoided the payment of congestion charges to the largest extent possible.

102.    In early 2014, Prescott experienced a sharp spike in the congestion charges coming from MISO (through its SWEPCO invoices).  Prescott asked for an explanation, and Woody Lally admitted that SWEPCO had not properly administered FTRs in the Day-Ahead Market.  SWEPCO then changed its management of the FTRs and Prescott's MISO congestion charges reduced substantially.

## COUNT I
## DETRIMENTAL RELIANCE

103.    Prescott hereby incorporates the facts and allegations set forth in Paragraph Nos. 1 through 102 set forth above herein as if set forth word for word.

104.    Prescott has reasonably relied upon repeated promises from SWEPCO over the course of the parties' relationship.

105.    The Prescott Water and Light Company distributes retail electric power to approximately 1,776 customers.  Historically, Prescott purchased wholesale capacity from Entergy with the power being delivered to Prescott's distribution system at a substation in Prescott owned by Entergy.  Entergy ended its relationship with Prescott in 2006.

106.    Prescott attempted to purchase capacity from a provider within the Entergy transmission system, but Entergy's studies showed that Prescott's required load of approximately 15,000 kW would require that Prescott build or upgrade additional transmission lines.  Entergy's demands made it financially infeasible for Prescott to purchase capacity from a provider within Entergy's transmission system.

107.    Instead, Prescott was forced to look outside of the Entergy transmission system footprint.  In mid-2008, Prescott entered into a Power Supply Agreement with SWEPCO (the "Original PSA").  Pursuant to the Original PSA, Prescott started purchasing its wholesale electric capacity from SWEPCO in January 2009.

22

108.    Under the Original PSA (as well as all subsequent PSAs between the parties), Prescott provided its forecasted load for power, and SWEPCO was required to sell and deliver the capacity and energy necessary for Prescott to meet the needs of its retail electric customers (residential, commercial and industrial).

109.    Under the PSAs, Prescott engaged SWEPCO as its agent for dealing with all transmission matters to ensure that Prescott had a reliable and cost-effective means for receiving the power necessary to meet its retail customers' needs.  SWEPCO represented itself as an experienced and expert agent within the wholesale electric market.  SWEPCO is a wholly-owned subsidiary of American Electric Power Company, a company that generates electricity for use and sale on the wholesale electric market and owns and maintains approximately 40,000 miles of transmission lines.

110.    SWEPCO, through AEP, is and agreed to be Prescott's Market Participant.  Only Market Participants can take part in and purchase power from the nationwide electrical grid managed by the various RTOs across the country.  Prescott is not a Market Participant, so it is completely dependent upon SWEPCO to properly engage in the wholesale electric market in a manner that best protects Prescott's ability to provide reliable and cost-effective electrical service to its customers.

111.    Beginning in January 2009, SWEPCO delivered the purchased power to Prescott at the Entergy Substation located in Prescott.  Prescott was responsible for payment to SWEPCO of the capacity and energy charges due to SWEPCO.

112.    SWEPCO is a member of the RTO known as Southwest Power Pool ("SPP").  SPP is responsible for ensuring and maintaining the efficient flow of wholesale electric capacity over

transmission lines within its assigned footprint from FERC. SPP sends Prescott a monthly invoice for the fees related to its services.

113.    In addition, Entergy charged Prescott (1) a tariff rate and (2) a fixed charge 3.00% of usage, and Prescott understood these rates to be in compliance with rates approved by the APSC.

114.    The rates set forth above were charged to and paid by Prescott from January 2009 through December 2013.

115.    The fees and charges assessed to Prescott for the delivery of the same capacity of wholesale electric capacity increased significantly beginning in early 2014. Prescott took action in an attempt to avoid the increased charges, but SWEPCO repeatedly induced Prescott to withdraw its objections or wait on SWEPCO to take actions to remedy Prescott's complaints.

116.    In 2011, Entergy opened a docket before the Arkansas Public Service Commission ("APSC") to integrate its transmission system into an RTO for the first time. Due to previous relationship between the companies, the common thought in the industry was that Entergy would join SPP (the same RTO in which SWEPCO is a member).

117.    However, as the APSC proceeding continued, it became apparent that Entergy would seek to join the system managed by Midwest Independent System Operator, Inc. ("MISO").

118.    With this development, Prescott feared that it would be subjected to increased RTO fees and transmission and congestion charges. Prescott filed an objection to Entergy's effort to integrate into MISO in the APSC proceeding. Prescott's objection was supported by the testimony of Henry Thompson.

119.    Mr. Thompson's testimony explained that if Entergy's transmission system was integrated into MISO, Prescott would see increased pancake transmission cost and a new congestion cost resulting in higher delivered energy cost for Prescott customers.

120.    Mr. Thompson's testimony included some proposed measures that could be taken to avoid the feared excessive rate pancaking.    He proposed that SWEPCO could build a transmission line to do away with the need for the use of MISO's lines to the Entergy Substation in Prescott.

121.    After Prescott filed Mr. Thompson's testimony, SWEPCO approached Prescott asking that it withdraw its objection filed in the Entergy docket.    SWEPCO saw the objections of Prescott and the proposed solutions contained in Mr. Thompson's testimony as a threat to its ability to sell power to Prescott through 2038.

122.    Initially, Prescott refused to withdraw its objection.    SWEPCO came back to Prescott with the June 2012 Assurances telling Prescott that Entergy's integration would not adversely impact the transmission charges paid for the power delivered at the Entergy Substation, and, if charges did increase SWEPCO assured Prescott that it would intervene with MISO and Entergy to remedy any rate pancaking or increased congestion charges.

123.    In reliance upon the June 2012 Assurances from its agent, Prescott withdrew its objection to Entergy's integration into MISO.

124.    Following Prescott's actual withdrawal of the objection, and in conformance with the representations made by SWEPCO that induced the withdrawal, Prescott, Hope city officials, SWEPCO and AEP representatives met in Hope on June 28, 2012.    The parties left this meeting with an agreement that (a) Hope would donate its existing 115 kv transmission line between Hope and Fulton SWEPCO, (b) SWEPCO would construct a 115 kv line from Hope to Prescott, and (c) SWEPCO would construct a 115/13.8 kv substation to serve Prescott (thereby doing away with the need to use the Entergy/MISO Substation).

125.    Realizing that the commitments made by the parties in the June 2012 Meeting would take some time to accomplish, Prescott moved forward with SWEPCO in good faith while time passed.

126.    Seeing no action for almost a year, Prescott and Hope reconvened the group in Hope on April 24, 2013.

127.    Prescott continued to voice its concerns over the potential for rate pancaking and increased congestion charges throughout 2013.  Prescott asked about modifying the 2011 PSA regarding these issues, finding another wholesale power supplier, and SWEPCO constructing the necessary facilities to remedy Prescott's concerns.  Prescott met with SWEPCO and SPP in the Late 2013 Meeting, and SWEPCO again assured Prescott that it had nothing to be concerned about because the charges from MISO (as the new RTO) would be less than the tariff and congestion charges currently being assessed by Entergy.

128.    Again, Prescott stood down and continued to comply with the requirements of the 2011 PSA (and pay the monthly invoices from SWEPCO and SPP) based upon the assurances made by its agent, SWEPCO, at the Late 2013 Meeting.

129.    As Prescott had feared, its transmission charges drastically increased in early 2014 when Entergy integrated into MISO.  In addition, in spite of SWEPCO's claimed expertise in the wholesale electric market, Prescott also saw increased congestion charges from MISO.

130.    Prescott regularly lodged complaints seeking redress from SWEPCO through its primary point of contact in transmission issues, Woody Lally.  Mr. Lally routinely assured Prescott that SWEPCO was considering what steps it could take to remedy the rate pancaking and congestion charge issues.

131.    Prescott and Hope met with SWEPCO on April 29, 2015 with the understanding that the meeting was for the purpose of SWEPCO explaining what actions it was prepared to take to alleviate the transmission issues.

132.    Discussions proceeded as Prescott continued to pay exorbitant transmission charges.  Prescott and SWEPCO again met in January 2016 based upon SWEPCO's continued promises to find a solution to Prescott's transmission charges.

133.    With no definitive resolution reached at this meeting, Prescott chose to invoke the dispute resolution process afforded under FERC regulations in February 2016.  SWEPCO represented that it would take part in the proceeding in good faith, but, after the parties exchanged information relevant to the transmission charge issues, SWEPCO refused to offer any remedy that did not require that Prescott build the necessary facilities to remedy the problems.

134.    SWEPCO's posture changed later in the year.  In 2016, Prescott was approached by a third-party independent transmission marketing company, GridLiance.  GridLiance offered to construct a transmission line from Hope to Prescott that would remedy Prescott's rate pancaking issues.  GridLiance sought to replace SWEPCO/AEP as Prescott's Market Participant and agent for transmission services.  GridLiance taking over this role would have resulted in reduced revenue for SWEPCO.

135.    SWEPCO made the January 2017 Assurances to Prescott with the intent of causing Prescott to cut off its discussions with GridLiance so as to protect the revenue stream from Prescott. In reasonable reliance upon the promises made by its agent, Prescott stopped all further discussions with GridLiance.

136.    Discussions continued between Prescott and SWEPCO culminating in meetings in Prescott in June 2017.  The parties left the last meeting with the understanding that SWEPCO

27

would soon provide proposals as to how to finally remedy the increased transmission charges incurred by Prescott.  SWEPCO's proposals fell short.  They were nothing more than rehashes of the prior discussions between the parties.  SWEPCO made no good faith effort to address the problems in a realistic manner.  None of the proposals made by SWEPCO provided Prescott with immediate relief from the charges at issue.  The January 2017 Assurances which were later put down in writing by SWEPCO following the June 2017 meetings were, again, nothing more than a tactic implemented by SWEPCO to induce Prescott to continue to work with and negotiate with SWEPCO.

137.    Later in 2017, due to SWEPCO's failure to follow through on its promises to remedy the rate pancaking and other MISO charges, Prescott attempted to move to a wholesale electric supplier within MISO's footprint.  SWEPCO/AEP, as Prescott's agent, refused to act according to Prescott's directions and MISO told Prescott it had no way of accomplishing such a move without SWEPCO's cooperation.  Seeing that Prescott was going to great lengths to stop the rate pancaking and congestion charges, SWEPCO approached Prescott with the Wind Catcher Promises.  SWEPCO assured Prescott that any increased transmission charges would be more than offset by the benefits Prescott would enjoy once the Wind Catcher Project was brought on-line by SWEPCO.  See Letter Agreement attached as Exhibit K.  In exchange for the Wind Catcher Promises, Prescott agreed not to object to SWEPCO's regulatory petitions for approval of the project.  Much of the financial relief promised to Prescott through the Wind Catcher Promises has not and will not come to fruition because SWEPCO has now abandoned the Wind Catcher Project.

138.    Prescott continues to suffer from the same rate pancaking charges today that it began to incur in early 2014.  As set out above, SWEPCO first made numerous representations that Entergy's integration into MISO would actually reduce the transmission charges paid by

Prescott.  Deferring to the expertise of its agent and Market Participant, Prescott reasonably relied upon SWEPCO's representations at that time.

139.    Following Entergy's integration into MISO, contrary to SWEPCO's assurances upon which Prescott relied, Prescott experienced increased transmission charges.  These increased charges took the form of both rate pancaking and congestion charges.  Prescott immediately disputed these charges and sought relief and a remedy from SWEPCO.

140.    Prescott and SWEPCO, along with several other third-parties, including Hope, SPP and MISO, have had numerous conversations and meetings regarding Prescott's complaints.  At every turn, SWEPCO has intentionally made assurances to Prescott that it would be taking action to remedy the complaints.  Prescott has relied upon these assurances and continued its relationship with SWEPCO.  All of SWEPCO's assurances have proven hollow.  SWEPCO's excuses have varied over time, but in the end SWEPCO has been unwilling to take appropriate action to remedy Prescott's increased transmission charges.

141.    Instead, once SWEPCO saw that its promise that Prescott's transmission charges would not increase if Entergy joined MISO was not true, SWEPCO started telling Prescott that it would take steps to remedy this issue.  SWEPCO's proposed solutions were unrealistic and lacked good faith as they all ultimately provided no financial relief to Prescott and its customers.  SWEPCO then blamed the continued excess charges on Prescott's refusal to spend millions of dollars to remedy the problem that SWEPCO assured Prescott would not happen.

142.    Prescott has been harmed by its reliance on SWEPCO's promises in the amount of the pancake rates and congestion fees and charges it has paid since early 2014 after Entergy's transmission system integrated into MISO.  Prescott's damages have totaled approximately $3,286,565 from January 2014 through December 2018, with such charges continuing through the

date of this filing and with the precise amounts subject to investigation and discovery in this cause of action.

143.    Prescott reserves the right to amend this pleading as further facts are learned through discovery in this matter.

## COUNT II
## BREACH OF FIDUCIARY DUTY

144.    Prescott hereby incorporates the facts and allegations set forth in Paragraph Nos. 1 through 143 set forth above herein as if set forth word for word.

145.    SWEPCO represented that it could provide reliable wholesale electric power to Prescott in an economical and efficient manner.

146.    Prescott is a municipal electric utility in the business of transmitting retail electric service to its customers.  Prescott has no experience or expertise in the wholesale power market.

147.    Based upon the expertise represented by SWEPCO, Prescott appointed SWEPCO as its agent and Market Participant (through its affiliate AEP) within the wholesale electric market. SWEPCO represented that it owned 5,225 megawatts of its own generating capacity.  This capacity, coupled with its alleged expertise in purchasing power from the nationwide and regional power grid, led Prescott to place its trust in SWEPCO to protect its interest and ensure that Prescott had reliable and cost-effective electric capacity to distribute to its customers.

148.    As alleged above, Prescott told SWEPCO it was concerned about the possibility of increased transmission charges prior to Entergy's electric system being integrated into MISO in late 2013.  In response to these concerns, SWEPCO assured Prescott that the integration would have no material impact on the cost of the wholesale power provided by SWEPCO to Prescott.  In fact, SWEPCO told Prescott that it would pay less following the integration than it paid under the Entergy tariff prior to December 2013.

149.    Based upon SWEPCO's assurances that any rate pancaking would not increase its transmission charges, Prescott withdrew the objection it had filed in the APSC docket concerning Entergy's integration into MISO.

150.    After Entergy's system was integrated into MISO, MISO sent its transmission charges to SWEPCO, and SWEPCO included them on its monthly invoice to Prescott.  The MISO charges resulted in rate pancaking and significantly increased congestion charges being assessed to Prescott.  Prescott was being forced to pay charges and fees from both SPP (SWEPCO's RTO) and MISO (Entergy's RTO).  Prescott immediately brought these increased costs, fees and charges to SWEPCO's attention.

151.    SWEPCO addressed Prescott's complaints by making repeated assurances that it would address and remedy the rate pancaking and increased congestion charges.

152.    SWEPCO proposed to address the rate pancaking issue by building a transmission line from one of its facilities within the SPP footprint directly to Prescott.  SWEPCO claimed this solution would circumvent the need to use Entergy's substation and the corresponding fees and charges from MISO.  While SWEPCO told Prescott it was working toward this solution, SWEPCO has never constructed such a transmission line.

153.    Additionally, SWEPCO proposed that Prescott would have to construct its own substation to accept the wholesale power transmitted by SWEPCO.  This solution was cost prohibitive for a municipality the size of Prescott.  When SWEPCO made repeated assurances in 2012 and 2013 to Prescott that the integration of Entergy's system into MISO would have no material impact on the rates paid by Prescott, SWEPCO did not mention that Prescott would have to spend millions of dollars to construct a substation in order to avoid exorbitant charges and fees.

Yet, once the increased charges began being assessed, the only solution SWEPCO could offer involved Prescott constructing facilities costing millions of dollars.

154.   Prescott placed its confidence and trust in SWEPCO to navigate the wholesale power market in such a manner to protect Prescott's interest and the interest of its customers. SWEPCO was concerned that rate pancaking would take place if Entergy's system was integrated into MISO.   SWEPCO knew that SPP would charge transmission fees for the power sold by SWEPCO to Prescott, and SWEPCO knew that the continued use of the Entergy substation would result in MISO charging fees and rates for the same wholesale electricity.   Yet, SWEPCO failed to properly and adequately inform Prescott of the consequences of this integration, and it failed to inform Prescott that the only solution it would propose to this issue would require Prescott's outlay of millions of dollars.

155.   SWEPCO violated the position of trust that it held with Prescott and breached the fiduciary duty it owed to Prescott as its agent and market participant for wholesale electric power.

156.   As alleged above, when Entergy sought approval from the APSC to integrate into MISO, Prescott voiced its concern that the integration would result in "congestion costs" being charged to Prescott.   Transmission congestion occurs when there is not enough transmission capability to support all the requests for transmission services in the market.   If power is purchased from the wholesale market during peak-usage hours or during other times of high demand, congestion charges are assessed.

157.   Participants in the wholesale electric market, such as SWEPCO, can avoid congestion charges through proper advance planning.   As its agent and market participant, Prescott relied upon SWEPCO to plan to purchase the power needed by Prescott so as to avoid congestion charges.   Prescott is required to provide SWEPCO with its retail electric load needs on a rolling

three (3) year cycle.  Prescott reasonably expected SWEPCO to take the information provided about its capacity and plan according in the wholesale market; thereby avoiding the need for Prescott to pay congestion charges.

158.     When Entergy integrated into MISO, Prescott was allocated Financial Transmission Right ("FTRs") for use in MISO's Day-Ahead Market.  FTRs are used by Market Participants to purchase capacity in advance so as to avoid the higher and unpredictable congestion charges being assessed against the wholesale electric power sold during peak-usage hours.

159.     SWEPCO failed to properly (1) plan to take advantage of the SPP Integrated Marketplace and (2) use the FTRs allocated to Prescott for use in MISO's Day-Ahead Market.

160.     SWEPCO has not been forthcoming with data requested by Prescott pertaining to the MISO congestion charges contained on its monthly invoices from SWEPCO.  Based upon information and belief, Prescott believes that SWEPCO used the FTRs allocated to Prescott to reduce the transmission costs of the power that SWEPCO sold to its retail customers.  After seeing a spike in its congestions charges, Prescott asked about the use of the FTRs.  Woody Lally, of SWEPCO, admitted that SWEPCO had not properly used the FTRs.  Following these discussions, the congestion charges to Prescott from MISO returned to amounts similar to those paid prior to the spike brought to SWEPCO's attention.

161.     As Prescott's fiduciary agent, SWEPCO should have been monitoring the monthly invoices sent to Prescott and noticed the spike in congestion charges.  Instead, based upon information and belief, SWEPCO knew that it had Prescott under a PSA for 30 years (that Prescott cannot terminate at its discretion, even with advance notice), and SWEPCO chose to use Prescott's FTRs to benefit its largest customer category, its retail customers.

162.    Prescott entrusted SWEPCO as its agent and Market Participant to use its expertise to navigate the wholesale electric markets of both MISO and SPP so as to avoid the exorbitant congestion charges.  SWEPCO failed to do so and breached the fiduciary duty it owed to Prescott.

163.    After years of seeking a remedy for the rate pancaking and congestion charges, SWEPCO provided no practical relief or remedy to alleviate the rate pancaking and congestion charges incurred by Prescott.  In September 2017, Prescott sought to find a wholesale electric provider located within the MISO footprint.  This solution would require that Prescott leave SWEPCO.

164.    In order for Prescott to move to a provider in MISO's territory, MISO had to conduct a study.  Prescott believed it was following the requirements of the Network Integration Transmission Service Agreement and MISO's procedures when\it asked MISO to conduct such a study in September 2017.  MISO rejected the request and informed Prescott that any such study request had to come from SWEPCO's parent AEP because AEP was Prescott's Market Participant under the NITS.

165.    Prescott immediately made a demand upon SWEPCO to request the study from MISO.  SWEPCO refused to request the required study from MISO.  Thereafter, Prescott requested information from MISO about how it could elect a new Market Participant.  On December 13, 2017, MISO responded that Prescott cannot choose a new Market Participant unless SWEPCO's parent, AEP, releases itself as Prescott's Market Participant.  Prescott made such a request, and SWEPCO refused to remove itself as Prescott's Market Participant.

166.    SWEPCO, as Prescott's agent, has failed and refused two direct request from Prescott.  Prescott placed its trust and confidence in SWEPCO to take actions in the wholesale electric marketplace to protect the interest of Prescott.  SWEPCO has done nothing to stop,

alleviate or avoid the increased and duplicate charges from MISO.  Moreover, SWEPCO continued its efforts to place its own financial interest above its fiduciary duty to Prescott by refusing to even allow Prescott to explore a move to another wholesale supplier.

167.    SWEPCO represented that it was best positioned to protect Prescott's interest in the wholesale electric market.  Prescott is forced to rely upon the expertise of an agent in order to receive the wholesale power needed to provide retail electric service to its customers.  SWEPCO has breached the fiduciary duties it owes to Prescott by placing its own interest as well as the interest of SPP above the interest of Prescott and its ratepayers.  Further, SWEPCO breached the fiduciary duties it owes to Prescott by disregarding the financial impact that its decisions would have on the rates, fees and charges assessed against Prescott by SPP and MISO.

169.    Prescott has suffered harm as a result of this breach of fiduciary duty.  The rate pancaking and congestion charges assessed against Prescott as a result of SWEPCO's breach of fiduciary duty have totaled approximately $3,286,565 from January 2014 through December 2018, with such charges continuing through the date of this filing and with the precise amounts subject to investigation and discovery in this cause of action.

## COUNT III
## NEGLIGENCE

170.    Prescott hereby incorporates the facts and allegations set forth in Paragraph Nos. 1 through 169 set forth above herein as if set forth word for word.

171.    SWEPCO agreed to serve as Prescott's agent under the PSA and NITS.  See Exhibit B, § 3.02, and Exhibit A.

172.    SWEPCO had and continues to have a duty to act in the best interest of its principal, the City of Prescott.

173.    SWEPCO, as Prescott's agent having expertise in the wholesale electric marketplace, had a duty to act in a manner in accordance with state and federal laws, rules and regulations in providing wholesale electric capacity to meet the needs of Prescott.

174.    SWEPCO, as Prescott's agent having expertise in the wholesale electric marketplace, had a duty to protect Prescott from the imposition of pancake rates, i.e. duplicate rate, from multiple RTOs.

175.    SWEPCO, as Prescott's agent having expertise in the wholesale electric marketplace, had a duty to effectively use, implement and discharge FTRs in such a manner to avoid Prescott having to pay excessive congestion charges for the wholesale capacity provided to Prescott.

176.    As set forth in further detail herein, SEWEPCO failed to exercise due and ordinary care in serving as Prescott's agent as it did nothing to avoid Prescott having to pay pancake rates and congestion charges.  Instead, SWEPCO acted in violation of its duty to Prescott and took actions designed and intended to serve the best financial interest of SWEPCO.

177.    SWEPCO failed and refused to construct or operate a transmission line from its facilities to serve Prescott.  As described above, SWEPCO informed Prescott that the construction and operation of such a line was the method by which Prescott could avoid rate pancaking and increased congestion charges.  As set forth in detail above, Prescott reasonably believed that SWEPCO was taking such action to address this matter in satisfaction of the duties it owed Prescott.

178.    Prescott has been harmed due to SWEPCO's failure to properly act as Prescott's agent in the wholesale electric power marketplace.  Prescott brought its concerns to SWEPCO's attention in 2012 before Entergy's transmission system was integrated into MISO's footprint.

Thereafter, Prescott repeatedly brought the rate pancaking and congestion charge issues to SWEPCO's attention, and the parties had numerous discussions on the subject.

179.    SWEPCO never took measures to remedy the rate pancaking and excessive congestion charges.

180.    As set forth in more detail above, in 2017, Prescott took the steps it believed to be necessary to commission a study of how it could change to a wholesale power supplier provider within MISO's footprint.  MISO refused to conduct such a study stating that the request had to originate from Prescott's "Market Participant."  Prescott made demand upon SWEPCO to request such a study, and SWEPCO refused.  SWEPCO chose to ignore its duty to properly navigate the wholesale electric power marketplace on Prescott's behalf, and, instead, chose to protect its own self-interest.

181.    Due to SWEPCO's negligent acts and omissions as Prescott's agent, Prescott has suffered harm in the approximate amount of $3,286,565 from January 2014 through December 2018, with such charges continuing through the date of this filing and with the precise amounts subject to investigation and discovery in this cause of action.

182.    Prescott hereby demands a trial by jury.

183.    Prescott reserves the ability to modify and amend the pleadings and the amount of damages set forth above as discovery progresses in this matter.

WHEREFORE, Plaintiffs respectfully request that they be granted the relief sought herein against Defendant Southwestern Electric Power Company, including, but not limited to an award of damages as requested above, plus their attorneys' fees and cost incurred herein, as well as all other just and proper relief to which Plaintiffs may be entitled.

Respectfully submitted,

BARBER LAW FIRM PLLC
425 West Capitol Avenue
Suite 3400
Little Rock, AR 72201
Telephone:  (501) 372-6175
Facsimile:  (501) 375-2802

By:     */s/ Jim L. Julian*_____
Jim L. Julian, AR BAR 79109
jjulian@barberlawfirm.com
Mark W. Hodge, AR BAR 97205
mhodge@barberlawfirm.com

and

A. Glenn Vasser, AR BAR 72108
MCKENZIE, VASSER & BARBER, PLLC
Attorneys at Law
P.O. Box 599
Prescott, AR  71857
Telephone: (870_ 887-2601
Facsimile:  (870) 887-5504
vasserbarber@centurytel.net

ATTORNEYS FOR PLAINTIFFS